**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-00118-DDD-STV

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

PAUL A. GARCIA, and
OFFICE GURU FRANCHISE GROUP, INC.,

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on the United States Securities and Exchange Commission's (the "SEC's") Motion for Entry of Final Judgments by Default Against Paul Garcia and Office Guru Franchise Group, Inc. (the "Motion") [#41] which has been referred to this Court [#42].  This Court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion.  For the following reasons, this Court respectfully **RECOMMENDS** that the Motion be **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND[1]

On August 2, 2019, Defendant Paul Garcia and another individual formed Gold Hawgs Development Corp. ("Gold Hawgs")  [#1, ¶¶ 1, 7, 14]  Mr. Garcia is a 50% owner of Gold Hawgs. [*Id.* at ¶ 7]  Gold Hawgs was formed to develop and market a digital asset, referred to as Gold Hawg tokens (the "Tokens").  [*Id.* at ¶ 14]  Gold Hawgs and Mr. Garcia represented that the Tokens would be backed by gold and that Gold Hawgs was raising funds to conduct an initial Token offering.  [*Id.* at ¶ 15]  Investors were promised an electronic wallet that would generate a limited number of Tokens, which could be sold for a profit.  [*Id.* at ¶ 17]  Gold Hawgs and Mr. Garcia sold sixteen debentures, generally for $25,000 each, to investors located in various states, raising a total of $400,100.[2]  [## 1, ¶ 20; 41-1, ¶ 20 n.1; 41-8]  Gold Hawgs provided a guarantee to investors that, if the venture failed, Gold Hawgs would return 50% of the money provided by investors.  [#1, ¶ 26]  The money raised through the debentures was sent to Gold Hawgs's bank accounts in Colorado.  [*Id.* at ¶¶ 21, 35]  Mr. Garcia was the sole signatory on both of Gold Hawgs's bank accounts.  [*Id.* at ¶¶ 51]

Before investing, investors generally received an oral presentation and a handbook explaining Gold Hawgs's business plan.  [*Id.* at ¶¶ 40-42]  The handbook, which was reviewed and approved by Mr. Garcia, represented that the money raised would be used "to help defray the costs associated with the launch of Gold Hawgs," and did not disclose

---

[1] The facts are drawn from the SEC's Complaint (the "Complaint") [#1] and the exhibits attached to the Motion, which, as explained below, are accepted as true.  *See United States v. Craighead*, 176 F. App'x 922, 924 (10th Cir. 2006); *Reg'l Dist. Council v. Mile High Rodbusters, Inc.*, 82 F. Supp. 3d 1235, 1242-43 (D. Colo. 2015).

[2] One investor appears to have invested $25,100.  [##41-1, ¶ 20 n.1; 41-8]

any plan to use the investors' funds for expenses unrelated to Gold Hawgs.  [*Id.* at ¶¶ 43-44]

Of the $400,100 raised from investors, Mr. Garcia transferred approximately $134,000 to Office Guru, a corporation solely owned and controlled by Mr. Garcia.  [*Id.* at ¶¶ 6, 50, 52]  Office Guru did not provide any consideration for these funds.  [*Id.* at ¶ 53]  These transfers began while the sale of debentures was ongoing.  [*Id.* at ¶ 48]  Of the $134,000 transferred to Office Guru, approximately $11,000 was spent on Gold Hawgs's business expenses.  [*Id.* at ¶ 55]  Mr. Garcia spent the remaining $123,000 of investors' funds deposited into Office Guru's accounts on various personal expenses and business expenses unrelated to Gold Hawgs.  [*Id.* at ¶¶ 56, 58; *see also* #41-1, ¶¶ 28-29]

Gold Hawgs never conducted an initial Token offering.  [#1, ¶ 22]  Gold Hawgs was unable to fulfill its guarantee to repay investors 50% of the money provided because Gold Hawgs lacked sufficient funds to do so.  [*Id.* at ¶ 27]  Instead, Gold Hawgs repaid all but one of the sixteen investors $6,875 each, or 27.5% of their initial $25,000 investment.  [*Id.*]

The SEC filed the Complaint against Mr. Garcia and Office Guru on January 18, 2022, alleging that Mr. Garcia defrauded investors of approximately $123,000 in violation of federal law and that Office Guru was unjustly enriched by the fraud.  [*See generally* #1]  Mr. Garcia and Office Guru were served on January 22, 2022.  [##8; 9]  On February 14, 2022, Mr. Garcia filed a "Rule 12(b)(7) Motion and Answer" [#11], which the Court struck for failure to comply with D.C.COLO.LCivR 7.1(d) and D.C.COLO.LAttyR 5(a)(5) and (b) [#19].  The Court ordered Mr. Garcia to file an answer or other response on or before March 21, 2022.  [*Id.*]  The Court further ordered that counsel make an appearance on

behalf of Office Guru (a corporation)[3] and file an answer or other response on or before March 21, 2022. [*Id.*] These deadlines were subsequently extended until April 29, 2022. [#23]

Neither Mr. Garcia nor Office Guru filed a timely answer, and counsel did not enter an appearance on behalf of Office Guru. On May 3, 2022, the Clerk of Court made entries of default as to both Mr. Garcia and Office Guru. [##28; 29] On June 24, 2022, Mr. Garcia filed a "Motion to Reschedule All Past and Present Case Deadlines" [#32], which was denied [#34]. The Court held a status conference in this matter on August 23, 2022, at which Mr. Garcia and Office Guru failed to appear. [#40] The SEC filed this Motion for Default Judgment on September 29, 2022. On December 5, 2022, Mr. Garcia filed another "Motion to Reschedule All Past and Present Case Deadlines" [#44], which was again denied when Mr. Garcia failed to appear at a hearing on the motion [#49].

## II. JURISDICTION

Default may be entered against a party who has failed to plead or otherwise defend. Fed. R. Civ. P. 55(a). Here, the entries of default [##28; 29] were proper because neither Defendant had properly responded. Before entering default judgment, however, the Court must first consider whether it has subject matter and personal jurisdiction over the absent party. *See Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d

---

[3] Pursuant to D.C.COLO.LAttyR 5(b), a corporation, partnership, or other legal entity "may not appear without counsel admitted to the bar of this court." *See also Tal v. Hogan*, 453 F.3d 1244, 1254 (10th Cir. 2006) ("It has been our long-standing rule that a corporation must be represented by an attorney to appear in federal court."); *Harrison v. Wahatoyas, L.L.C.*, 253 F.3d 552, 556 (10th Cir. 2001) ("As a general matter, a corporation or other business entity can only appear in court through an attorney and not through a non-attorney corporate officer appearing pro se.").

4

767, 772 (10th Cir. 1997); *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202-03 (10th Cir. 1986).

The Court has subject matter jurisdiction over the SEC's claims against Mr. Garcia and Office Guru[4] pursuant to Section 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v(a); Section 27(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a); and 28 U.S.C. § 1331.

To determine whether there is personal jurisdiction, this Court must first address the adequacy of service. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."); *Okla. Radio Assocs. v. Fed. Deposit Ins. Corp.*, 969 F.2d 940, 943 (10th Cir. 1992) ("[S]ervice of process provides the mechanism by which a court having venue and jurisdiction over the subject matter of an action asserts jurisdiction over the person of the party served."); *Venable v. Haislip*, 721 F.2d 297, 300 (10th Cir. 1983) (finding "default judgment subject to attack as void for failure to serve defendant"). Rule 4(e)(2)(A) of the Federal Rules of Civil Procedure provides that individuals may be served by "delivering a copy of the summons and of the complaint to the individual personally." On January 25, 2022, the SEC filed a return of service, which stated that process server Kristallynn Freel personally

---

[4] Office Guru is a relief defendant. [#1, ¶¶ 78-81] "A 'relief defendant' (a.k.a. 'nominal defendant') 'is a person who can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because he has no ownership interest in the property which is the subject of litigation.'" *U.S. Commodity Futures Trading Comm'n v. Lee*, 445 F. App'x 126, 128 (10th Cir. 2011) (quoting *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir.1991)). "[O]nce jurisdiction over the defendant who is the source of the property is established, the court has jurisdiction over the relief defendant as well." *SEC v. Erwin*, No. 13-CV-03363-CMA-KMT, 2020 WL 7310583, at *2 (D. Colo. Dec. 11, 2020) (quoting *SEC v. George*, 426 F.3d 786, 800 (6th Cir. 2005)).

served process on Mr. Garcia at his address in Severance, Colorado.  [#8]   Accordingly, this Court finds that Mr. Garcia was properly served.

Rule 4(h)(1)(B) of the Federal Rules of Civil Procedure provides that a corporation may be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process."  On January 25, 2022, the SEC filed a return of service, which stated that process server Kristallynn Freel personally served process on Mr. Garcia as the registered agent of Office Guru at Mr. Garcia's address in Severance, Colorado.  [#9]  Accordingly, this Court finds that Office Guru was properly served.

Finally, the Court considers whether it has personal jurisdiction over Mr. Garcia and Office Guru.  "[T]he plaintiff need only make a prima facie showing [of personal jurisdiction] if the motion [for default judgment] is decided only on the basis of the parties' affidavits and other written materials."  *Dennis Garberg & Assocs., Inc.*, 115 F.3d at 773.  The SEC asserts in the Complaint that Office Guru is a Colorado corporation and that Mr. Garcia is a resident of Colorado.  [#1 at ¶¶ 5-6]  The record indicates that both Defendants were served in Colorado.  [##8; 9]  Based on this showing, the Court finds that it has personal jurisdiction over Mr. Garcia and Office Guru.  *See SEC v. Dalmy*, No. 19-CV-00745-RM-NYW, 2020 WL 108664, at *2 (D. Colo. Jan. 9, 2020) ("[T]he Court has personal jurisdiction over parties who are Colorado residents or were Colorado residents at the time when they committed the alleged acts which were the subjects of complaint."); *Rocky Mountain Chipseal, LLC v. Sherman Cty.*, 841 F. Supp. 2d 1224, 1228 (D. Colo. 2012) ("[T]he general rule [is] that personal service upon someone present in the forum state confers jurisdiction over the person served."); *see generally Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 474 (1985) (explaining that the touchstone of personal jurisdiction is establishing "minimum contacts" with the forum state).

## III.    LIABILITY AND RELIEF

Having determined that jurisdiction has been established, this Court turns to the merits of the SEC's request for default judgment.  The Court must consider whether the unchallenged facts constitute a legitimate cause of action such that a judgment should be entered.  *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010); *Malibu Media, LLC v. Ling*, 80 F. Supp. 3d 1231, 1239 (D. Colo. 2015).  "There must be a sufficient basis in the pleadings for the judgment entered."  *Bixler*, 596 F.3d at 762 (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975)).  In determining whether a claim for relief has been established, the well-pleaded facts of the complaint are deemed true.  *See United States v. Craighead*, 176 F. App'x 922, 924 (10th Cir. 2006); *Malibu Media*, 80 F. Supp. 3d at 1239.  Undisputed facts set forth in any affidavits and exhibits are also accepted as true.  *See Reg'l Dist. Council v. Mile High Rodbusters, Inc.*, 82 F. Supp. 3d 1235, 1242-43 (D. Colo. 2015).  Finally, the relief provided in a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ. P. 54(c).

The Court begins with Mr. Garcia's and Office Guru's liability, given the facts as established by the default.  The Court then turns to the relief requested by the SEC.

### A.    Liability of Mr. Garcia and Office Guru

The SEC alleges that Mr. Garcia violated Section 10(b) and Rule 10b-5 of the Exchange Act and Sections 17(a)(1) and (3) of the Securities Act.  [#1 at ¶¶ 72-77]  To prove a claim under Section 10(b) of the Exchange Act and Rule 10b-5(a) or (c), the SEC must demonstrate that the defendant, with scienter, in connection with the purchase or

sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; . . . or (c) engaged in an act, practice or course of business which operated or would operate as a fraud or deceit upon any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (c); *see also Aaron v. SEC*, 446 U.S. 680, 691 (1980) (holding that proof of scienter is required for Section 10(b)).   Similarly, to prove a claim under Section 17(a)(1) or (3) of the Securities Act, the SEC must show that the defendant in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or by the use of the mails, directly or indirectly: (1) employed a device, scheme or artifice to defraud; . . . or (3) engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a).  Proof of scienter is required for Section 17(a)(1), whereas negligence is sufficient under Section 17(a)(3).  *Aaron*, 446 U.S. at 697.  Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Scienter can be established by a showing of knowledge or recklessness.  *Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1552 (10th Cir. 1992).

Here, the undisputed facts demonstrate that Mr. Garcia offered and sold securities in the form of debentures of Gold Hawgs Development Corp.  [##1 at ¶¶ 2, 20, 28]; *see also* 15 U.S.C. § 77b(a)(1) (defining the term "security" to include "debenture[s]" for the purposes of the Securities Act); § 78c(a)(10) (defining the term "security" to include "debenture[s]" for the purposes of the Exchange Act).  The SEC has further demonstrated that Mr. Garcia used interstate commerce or the mails to defraud investors by soliciting investments from investors in multiple states (including Colorado, New York, Texas,

Arizona, and Montana) and directing them to send checks or wire transfers to Gold Hawgs's Colorado bank accounts.  [#1 at ¶¶ 20-21]

Next, the SEC has demonstrated that Mr. Garcia knowingly or recklessly engaged in a transaction or course of business that operated as fraud or deceit upon the investors. The undisputed allegations in the Complaint establish that Mr. Garcia offered investments in Gold Hawgs and represented through a handbook approved by Mr. Garcia and oral presentations made at the direction of Mr. Garcia that these investments would be used for the creation and promotion of the Tokens, which would be backed by gold and sold to the public for a profit.  [*Id.* at ¶¶ 15-19, 37-44, 46-47]  Beginning while the sale of debentures were ongoing, Mr. Garcia (who was the sole signatory on Gold Hawgs's bank accounts) transferred approximately $134,000 of the $400,100 raised from investor's funds to Office Guru—a corporation solely owned and controlled by Mr. Garcia—for no consideration.  [*Id.* at ¶¶ 48-53]  Mr. Garcia paid approximately $11,000 of Gold Hawgs's expenses from the Office Guru account.  [*Id.* at ¶ 55]  Mr. Garcia misappropriated the remaining $123,000 transferred to Office Guru, spending it on personal and business expenses unrelated to Gold Hawgs.  [*Id.* at ¶ 56]  This misappropriation resulted in losses to Gold Hawgs's investors, who were guaranteed at least 50% of their initial investment should Gold Hawgs fail.  [*Id.* at ¶¶ 26, 57]  Instead, fifteen of the sixteen investors were repaid $6,875 each, or 27.5% of their initial investment.  [*Id.* at ¶ 27]

This course of conduct consisted of fraudulent and deceptive acts operating as a fraud or deceit on the investors and designed to deceive investors about the use of their funds.  While representing to investors that their funds would be used for Gold Hawgs business, Mr. Garcia transferred these funds to an account that he controlled for use

unrelated to Gold Hawgs.  Further, Mr. Garcia, who reviewed and approved the representations made to investors and was the sole signatory on Gold Hawgs's bank accounts responsible for the transfers, acted with scienter in committing this fraud. Accordingly, the SEC has established that Mr. Garcia committed violations of Section 17(a)(1) and (3) of the Securities Act, and Section 10(b) and Rule 10b-5 of the Exchange Act.

The SEC has also established that it is entitled to relief from Office Guru.  To establish a claim for disgorgement against a relief defendant, the SEC must show that the relief defendant: 1) received ill-gotten funds; and 2) does not have a legitimate claim to those funds. *SEC v. Erwin* (*Erwin II*), No. 13-CV-03363-CMA-KLM, 2022 WL 2063227, at *2 (D. Colo. June 8, 2022)  (citing *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991)). Here, the well-pled allegations of the Complaint demonstrate that Office Guru received the funds misappropriated by Mr. Garcia.  [#1 at ¶¶ 66-71]  After paying $11,000 in Gold Hawgs's business expenses, Office Guru received a net gain of approximately $123,000 from the misappropriated funds.  [*Id.* at ¶ 69]  Office Guru provided no consideration for these funds.  [*Id.* at ¶ 70]  Accordingly, Office Guru received ill-gotten funds with no legitimate claim to them and is subject to disgorgement.  *See* 15 U.S.C. § 78u(d)(3)(A)(ii) ("[T]he court shall have jurisdiction to . . . require disgorgement . . . of any unjust enrichment by the person who received such unjust enrichment as a result of [a securities law violation].").

### B.    The SEC's Requested Relief

"In the context of a default judgment, a plaintiff 'must . . . establish that on the law it is entitled to the relief it requests, given the facts as established by the default.'"  *SEC*

*v. Erwin* (*Erwin I*), No. 13-CV-03363-CMA-KMT, 2020 WL 7310583, at *1 (D. Colo. Dec.

11, 2020) (quoting *PHL Variable Ins. Co. v. Bimbo*, No. 17-CV-1290, 2018 WL 4691222,

at *2 (E.D.N.Y. Aug. 30, 2018), *report and recommendation adopted*, No. 17-CV-1290,

2018 WL 4689580 (E.D.N.Y. Sept. 28, 2018)).  While the Court accepts the well-pleaded

facts of the complaint as true on a motion for default judgment, allegations relating to the

amount of damages are generally not accepted as true.  *Magic Carpet Ski Lifts, Inc. v.

S&A Co., LTD*, No. 14-cv-02133-REB-KLM, 2015 WL 4237950, at *6 (D. Colo. June 8,

2015), *report and recommendation adopted*, 2015 WL 4162586 (D. Colo. July 9, 2015).

Instead, the court must hold a hearing on the damages claimed before entering default

judgment, unless "the amount claimed is a liquidated sum or one capable of mathematical

calculation."  *Hunt v. Inter-Globe Energy, Inc.*, 770 F.2d 145, 148 (10th Cir. 1985).  "In

making an independent determination of the amount of damages, the court may rely on

detailed affidavits or documentary evidence."  *Erwin I*, 2020 WL 7310584, at *4 (quotation

omitted).

### 1.    Disgorgement and Prejudgment Interest

The SEC seeks disgorgement of ill-gotten gains against Mr. Garcia and Office

Guru.  [#1 at 14]  "In any action or proceeding brought or instituted by the Commission

under any provision of the securities laws, the Commission may seek, and any Federal

court may grant, any equitable relief that may be appropriate or necessary for the benefit

of investors."  15 U.S.C. § 78u(d)(5).  The United States Supreme Court recently

reevaluated the availability of disgorgement as an equitable remedy in an SEC

enforcement action, holding that "a disgorgement award that does not exceed a

wrongdoer's net profits and is awarded for victims is equitable relief permissible under

§ 78u(d)(5)." *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020).[5] "[A] disgorgement order that 'results in a "reasonable approximation" of illegal profits' falls within a district court's broad discretion to order equitable disgorgement." *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *14 (10th Cir. Dec. 16, 2021) (quoting *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006)); *see also id.* at *16 ("[W]e do not believe *Liu* provides sufficient basis to displace the reasonable approximation standard from *Maxxon*.").

The SEC seeks disgorgement of $123,282.43. [#41, 1-2, 11, 13] The SEC arrived at this number by examining bank transfers from Gold Hawgs's bank accounts to Office Guru's bank accounts. [#41-1, ¶¶ 24, 26, 27] The SEC asserts through a sworn declaration that, after a series of transfers, Office Guru ultimately received a total gain from Gold Hawgs of $134,230.98. [*Id.* at ¶ 24] The SEC further asserts through a sworn declaration that Office Guru paid a total of $10,948.55 in expenses on behalf of Gold Hawgs. [*Id.* at ¶¶ 25-26]; *see Liu*, 140 S. Ct. at 1950 ("[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)."). These assertions are supported by Mr. Garcia's testimony [#41-10, 28:21-29:11, 110:17-111:20; 122:8-16; 144:13-145:5], as well as exhibits documenting the banking activity in the relevant Gold Hawgs and Office Guru bank accounts [##41-5; 41-7]. The Court agrees with the SEC that no hearing is necessary to calculate the amount of disgorgement, as the amount is capable of mathematical calculation based on the declaration and exhibits attached to the

---

[5] In addition, Congress recently amended 15 U.S.C. § 78u to explicitly provide that: "In any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may order, disgorgement." *Id.* § 78u(d)(7). Because this provision does not describe the extent of disgorgement permitted, the Court will continue to use the guidance provided by the United States Supreme Court in *Liu* in determining the extent of disgorgement that is proper in this case.

Motion.  The Court finds that the SEC's requested amount of $123,282.43, representing the net gain from Gold Hawgs minus the expenses paid on Gold Hawgs's behalf, is supported by sufficient evidence and is a reasonable approximation of Mr. Garcia's and Office Guru's illegal profits.

The SEC also seeks prejudgment interest on the disgorgement amount in the amount of $10,110.42.  [#41, 11]  "As with disgorgement, an award of prejudgment interest lies within the discretion of the Court."  *Erwin II*, 2022 WL 2063227, at *5 (quoting *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007)).  "Prejudgment interest on a disgorgement amount is intended to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government."  *SEC v. Chen*, No. C17-0405JLR, 2022 WL 3370206, at *5 (W.D. Wash. Aug. 16, 2022) (quoting *SEC v. Contorinis*, 743 F.3d 296, 307-08 (2d Cir. 2014)). The SEC may receive prejudgment interest on the disgorgement amount "based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 21 U.S.C. § 6621(a)(2)."  *Erwin I*, 2020 WL 7310584, at *5; *see also Dalmy*, 2020 WL 108664, at *6 ("[T]he Court agrees that prejudgment interest calculated in the same manner in which the Internal Revenue Service calculates tax underpayments is appropriate, *i.e.*, under 26 U.S.C. § 6621(a)(2).").  Here, the SEC calculated the amount of $10,110.42 by using the Internal Revenue Service's rate for underpayment of taxes.  [##41, 13; 41-1, ¶ 30; 41-11]  The Court finds that awarding prejudgment interest in the amount of $10,110.42 is appropriate.

Next, the Court considers the SEC's request to impose disgorgement liability jointly and severally on both Mr. Garcia and Office Guru.  In *Liu*, the United States Supreme

Court explained that joint-and-several disgorgement liability may be "at odds with the
common-law rule requiring individual liability for wrongful profits."  140 S. Ct. at 1949.
However, the Court noted that joint and several liability could be appropriate "for partners
engaged in concerted wrongdoing" and that courts had "flexibility to impose collective
liability."  *Id.* (citing *Ambler v. Whipple*, 20 Wall. 546, 559 (1874)).  Here, the Court finds
that joint-and-several liability is appropriate.  Mr. Garcia is the sole owner and controller
of Office Guru, and Mr. Garcia controlled Office Guru's bank accounts.  [#1, ¶¶ 5-6, 58]
Any benefits that accrued to Office Guru accrued to Mr. Garcia, who used the funds
transferred into the Office Guru bank account for both personal and business transactions
not related to Gold Hawgs.  [*Id.* at ¶ 58]  *See SEC v. Johnson*, 43 F.4th 382, 390 (4th Cir.
2022) ("[W]e must decide whether the district court's joint-and-several disgorgement order
was warranted. Given Johnson's control of Owings and Owings's conduct in the scheme,
we find it was."); *SEC v. Voight*, No. CV H-15-2218, 2021 WL 5181062, at *12 (S.D. Tex.
June 28, 2021) ("Because Voight used each of [the] entities as his alter ego to engage in
concerted wrongdoing to carry out the fraud, it is both proper and consistent with *Liu* to
order Voight jointly and severally liable for the disgorgement imposed against each of the
entities he controlled."), *aff'd*, No. 21-20511, 2023 WL 1778178 (5th Cir. Feb. 6, 2023);
*SEC v. Penn*, No. 14-CV-581 (VEC), 2021 WL 1226978, at *13 (S.D.N.Y. Mar. 31, 2021)
(finding joint-and-several liability appropriate when "Penn completely dominated the
Camelot Entities and that, at least for purposes of the transactions at issue, there [wa]s
no distinction between them"), *aff'd*, No. 21-1348-CV, 2022 WL 2517218 (2d Cir. July 7,
2022); *see also S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)
("[W]here a firm has received gains through its unlawful conduct, where its owner and

chief executive officer has collaborated in that conduct and has profited from the violations, and where the trial court has, within the proper bounds of discretion, determined that an order of disgorgement of those gains is appropriate, it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order.").

Accordingly, the Court RECOMMENDS that disgorgement be ordered in the amount of $133,392.85 from Mr. Garcia and Office Guru, jointly and severally.

### 2. Injunctive Relief

The SEC requests that the Court enjoin Mr. Garcia from future violations of the anti-fraud provisions of the federal securities laws. [#1, 13] "An injunction based on the violation of securities laws is appropriate if the SEC demonstrates a reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities laws in the future." *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993) (citing 15 U.S.C § 77t(b); 15 U.S.C. § 78u(d) and *SEC v. Bonastia*, 614 F.2d 908, 912 (3rd Cir.1980)). "Determination of the likelihood of future violations requires analysis of several factors, such as the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations." *Id.* (citations omitted). "Although no single factor is determinative, [the Tenth Circuit has] previously held that the degree of scienter 'bears heavily' on the decision." *Id.* (citing *SEC v. Haswell*, 654 F.2d 698, 699 (10th Cir.1981)).

Here, the Court finds that the factors weigh in favor of enjoining Mr. Garcia from violating the laws and rules at issue in this matter. Mr. Garcia's violations were serious,

resulting in the misappropriation of over $123,000. [#41-1, ¶¶ 24, 26-27] Mr. Garcia also acted with a high degree of scienter. Mr. Garcia was the sole signatory on Gold Hawgs's bank accounts and the controller of Office Guru's bank accounts where he transferred the misappropriated funds. [#1 at ¶¶ 5-6, 51, 58]  Mr. Garcia began the misappropriations while still selling debentures, and used the funds for various personal expenses instead of defraying Gold Hawgs's business expenses, as promised to investors in the handbook that Mr. Garcia approved. [*Id.* at ¶¶ 45-57] This was not a series of negligent errors, but an intentional course of action designed to defraud Gold Hawgs's investors. *See SEC v. Curshen*, 372 F. App'x 872, 883 (10th Cir. 2010) (holding that a permanent injunction was appropriate based on findings of "strong circumstantial evidence of intentional conduct"); *cf. Pros Intern., Inc.*, 994 F.2d at 769-70 (holding that errors "result[ing] from gross negligence and inexperience," did not suffice to support a permanent injunction, as "there ha[d] been no showing that [the defendant] intended to defraud investors"). Next, Mr. Garcia's occupation presents opportunities for future violations. Mr. Garcia is accredited as a Chartered Financial Analyst with a history of working as a financial advisor and has experience in taking a company public. [#41-1 at ¶ 31] Mr. Garcia is now the sole owner of Office Guru, which performs accounting and tax preparation services. [#1 at ¶¶ 5-6] While "[t]he mere fact that the Defendant will remain an accountant is insufficient for an injunction," *Pros Intern.*, 994 F.2d at 769, the Court finds that Mr. Garcia's history and current occupation nevertheless weigh in favor of an injunction. *See Curshen*, 372 F. App'x at 883 (holding that a defendant's "history of being involved with stock promotion and stock trading" supported a permanent injunction in a case arising out of trading-related violations). Finally, Mr. Garcia, who has defaulted and failed to meaningfully

participate in this action, has provided no recognition of his wrongful conduct or given any assurances against future violations.    *See SEC v. Dubovoy*, No. CV 15-6076, 2021 WL 2581756, at *5 (D.N.J. June 23, 2021) ("[B]y failing to appear in this action, the Defaulting Defendants have shown no respect for U.S. securities laws and demonstrated no contrition for their unlawful conduct[.] [S]imilarly, by failing to appear, the Defaulting Defendants have offered no assurances that they will act lawfully in the future[.]").

Because all of the factors weigh in favor of the requested injunction, the Court respectfully RECOMMENDS that a permanent injunction against further violations of Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act be GRANTED.

Next, the SEC requests that the Court "[e]nter an injunction . . . permanently restraining and enjoining [Mr.] Garcia from, directly or indirectly, including, but not limited to, through any entity owned or controlled by [Mr.] Garcia, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent [Mr.] Garcia from purchasing or selling securities for his own personal account." [#1 at 13]  The SEC argues that such an injunction "is necessary to prevent [Mr.] Garcia from having the opportunity to commit fraud."  [#41 at 10]  As authority, the SEC cites to cases where the SEC and the defendant entered judgments on consent containing similar injunctions against participating in the securities market.  [#41 at 10-11 (citing *SEC v. Chatfield PCS Ltd.*, No. 21-cv-00641-DDD-STV (D. Colo. Mar. 30, 2022) and *SEC v. Cash Capital, LLC*, No. 3:17-cv-01536-L-AGS (S.D. Cal. Apr. 25, 2019))]  Here, however, Mr. Garcia has not consented to the entry of judgment, and, based on the undisputed

facts in this case, the Court finds it inappropriate to enjoin Mr. Garcia from any participation (lawful or not) in the securities market beyond his own personal account.

A Court is permitted to enjoin any acts or practices which constitute or will constitute a violation of the Securities or Exchange Acts. 15 U.S.C. §§ 77t(b); 78u(d)(1). Beyond injunctions of acts which constitute or will constitute violations, the Securities and Exchange Acts provide courts with the authority to enjoin otherwise lawful acts when specific conditions are met. *See* 15 U.S.C § 77t(e) (permitting a court to prohibit a person who violated a particular section of the Securities Act from acting as an officer or director of certain securities issuers); § 78u(d)(2) (permitting a court to prohibit a person who violated a particular section of the Exchange Act from acting as an officer or director of certain securities issuers); § 77t(g) (permitting a court to prohibit a person from participating in the offering of penny stock); § 78u(d)(6)(A) (same). And the Exchange Act allows a court to grant "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). But enjoining an individual from any participation in the securities market except for personal use is not specifically authorized by the Securities or Exchange Act.

It very well may be the case that, under specific circumstances, such an injunction may be warranted under the Court's authority to enjoin future unlawful actions pursuant to Sections 77t(b) and 78u(d)(1), or to grant other equitable relief under Section 78u(d)(5). For example, if an individual has an extensive history of violations, a court may perhaps safely assume that any future participation in the securities market will likely lead to unlawful activity. *See Dalmy*, 2020 WL 108664, at **1, 5-6 (permanently enjoining a disbarred lawyer from providing legal services in connection with the offer or sale of

securities when, after being placed on a list of prohibited attorneys and subsequently suspended from practicing before the SEC, the individual fraudulently prepared and submitted at least 85 opinion letters and assisted clients with SEC filings over a course of approximately four years).   Here, however, Mr. Garcia's fraudulent activity, while serious, appears confined to the isolated Gold Hawgs endeavor.   The SEC has not satisfied the Court that Mr. Garcia is incapable of legitimately participating in the securities market such that he must be enjoined from all participation in order to prevent future violations.   While the Court is satisfied that the SEC has established its entitlement to an injunction against future violations of federal antifraud provisions, for the foregoing reasons, the Court respectfully RECOMMENDS that the SEC's request for an order permanently enjoining Mr. Garcia from participating in the issuance, purchase, offer, or sale of any security be DENIED.

### 3.  Civil Penalties

The SEC requests that the Court impose a civil penalty against Mr. Garcia in the amount of $207,183.  [#41, 14]  Under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, when a violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and directly or indirectly resulted in, or created a significant risk of "substantial losses to other persons," third-tier penalties are permitted.  15 U.S.C. § 77t(d)(2)(C); § 78u(d)(3)(B)(iii); *Geman v. SEC*, 334 F.3d 1183, 1196 (10th Cir. 2003).  For a natural person, third-tier penalties are capped at the greater of $223,229 per violation or the gross amount of pecuniary gain to such person as a result of the violation.   15 U.S.C. § 77t(d)(2)(C); § 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1001(b) (adjusting civil penalties for inflation pursuant to the Federal Civil Penalties

Inflation Adjustment Act, as amended by the Federal Civil Penalties Inflation Adjustment and Improvement Act of 2015 (28 U.S.C. § 2461)); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2023), available at https://www.sec.gov/files/civil-penalties-inflation-adjustments_1_1.pdf (last visited March 29, 2023). Courts have discretion in awarding penalties, and typically consider the following factors when imposing penalties:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. GenAudio Inc.*, 32 F.4th 902, 954 (10th Cir. 2022) (quoting *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003)).

Here, the SEC seeks the highest penalty possible under the facts of this case.[6] While the Court agrees that penalties are appropriate in this case, the Court finds that the amount should be reduced to $123,282.43, to reflect Mr. Garcia's ill-gotten gains. As discussed above, Mr. Garcia's violation was serious and the well-pled allegations reflect a high degree of scienter. In addition, the record in this case does not reflect that Mr. Garcia has admitted wrongdoing or cooperated with authorities. Nor does it reflect that reduction would be appropriate due to Mr. Garcia's financial condition. These factors support a heightened penalty. However, the Complaint also establishes Mr. Garcia and Gold Hawgs did return a not insignificant portion of the money owed to most investors upon Gold Hawgs's collapse, undercutting the "egregious" nature of Mr. Garcia's violation

---

[6] The SEC's Motion was filed in 2002, and the $207,183 requested was the highest possible penalty, adjusted for inflation, at the time of that filing.

and limiting the losses experienced by Gold Hawgs investors.  [#1, ¶ 27 (alleging that Gold Hawgs repaid all but one investor 27.5% of their initial investments, as opposed to the guaranteed 50% should Gold Hawgs fail)]  In addition, there are no allegations that Mr. Garcia has a history of securities violations.  These factors weigh in favor of reducing the penalty suggested by the SEC.

Accordingly, the Court respectfully RECOMMENDS that the SEC's request for civil penalties be GRANTED IN PART, and that a penalty of $123,282,42 be imposed on Mr. Garcia.

## IV.    CONCLUSION

For the foregoing reasons, this Court respectfully **RECOMMENDS** that the SEC's Motion for Default Judgment [#41] be **GRANTED IN PART** and **DENIED IN PART**. Specifically, this Court **RECOMMENDS** that:

(1)    The SEC's request for an injunction permanently enjoining Mr. Garcia from violating, directly or indirectly, Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act be **GRANTED;**

(2)    The SEC's request for an injunction permanently enjoining Mr. Garcia from participating in the issuance, purchase, offer, or sale of any security except for purchasing or selling securities for his own personal account be **DENIED;**

(3)    The SEC's request for an order that Mr. Garcia and Office Guru disgorge, on a joint and several basis, all ill-gotten gains plus prejudgment interest, for a total amount of $133,392.85, be **GRANTED;**

(4)     The SEC's request that the Court impose a civil penalty upon Mr. Garcia be

**GRANTED IN PART**, and that the Court impose a civil penalty upon Mr.

Garcia in the amount of $123,282.43.[7]


DATED:  March 29, 2023                         BY THE COURT:

                                               s/Scott T. Varholak
                                               United States Magistrate Judge

---

[7] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.   "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review."  *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).